UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MYLIFE.COM, INC., a corporation,<br><br>    and<br><br>JEFFREY TINSLEY, individually and as an officer of MYLIFE.COM, INC.,<br><br>    Defendants. | Case No. 2:20-cv-6692-JFW (PDx)<br><br>**STATEMENT OF DECISION DENYING MYLIFE.COM, INC.'S MOTION TO DISMISS** |

Before the Court is Defendant MyLife.com, Inc.'s ("MyLife") motion to dismiss the Complaint (Dkt. 29). For the reasons that follow, the motion is DENIED in its entirety.

## I. RELEVANT FACTS

The United States' Complaint (Dkt. 1) ("Compl.") includes five counts alleging that Defendants MyLife and Jeffrey Tinsley violated Section 5 of the FTC Act, 15 U.S.C. § 45(a); the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.

The Complaint alleges the following facts. Defendants sell consumer background reports on their website, www.MyLife.com. Their business model encourages consumers to run free searches on that website for a person's name. The search results display screens that suggest the searched-for person has criminal or sexual offense records, bankruptcies, liens, or legal judgments against the person—whether or not that is true—generate a "reputation score" for that person, and then encourage the searcher to buy a MyLife subscription to see a background report on the searched-for person that includes those records. Compl. ¶¶ 7, 25–29.

Defendants market their background reports for use in establishing an individual's eligibility for employment, loans, and housing, displaying testimonials praising the reports as suitable for those purposes. *Id.* at ¶ 25. Defendants do not, however, try to determine whether the information in those background reports is accurate, who is obtaining the reports, or why. *Id.* at ¶¶ 9, 38. Defendants' marketing has also included telemarketing calls in which sales agents encourage consumers to upgrade to paid subscriptions or try to persuade them not to cancel their subscriptions or the automatic renewal thereof, or refuse consumers' requests for refunds, without disclosing key aspects of MyLife's payment, cancellation, subscription management, and refund policies. *Id.* at ¶¶ 8, 34–36. Since 2009,

millions of American consumers have paid for MyLife premium subscriptions. *Id.* at ¶¶ 7–8.

The Complaint alleges that Defendants fail to inform consumers of their policies that charge subscribers a lump sum upfront for the total cost of a subscription (*e.g.*, charging $83.40 upfront for a 12-month subscription, instead of $6.95 each month), that paid subscriptions will automatically renew upon cancellation unless the subscriber takes affirmative steps to cancel, that frustrate subscribers' efforts to cancel or change the automatic renewal feature of a subscription, and that refuse refund requests in most cases. *Id.* at ¶¶ 32–36. Defendants have allegedly engaged in such practices off-and-on for years, despite having settled lawsuits regarding those practices and promising to stop the offending behavior. *Id.* at ¶¶ 6, 37.

## II.     DISCUSSION

### A. The Complaint Satisfies Federal Rule of Civil Procedure 8(a) or 9(b).

MyLife contends that Federal Rule of Civil Procedure 9(b) applies to the entire Complaint, and that the Complaint fails to comply with the rule and should thus be dismissed. *See* MyLife.com, Inc.'s Memorandum of Points and Authority in Support of Motion to Dismiss the Complaint (Dkt. 29) ("Memo.") at 5–6, 9–10, 15–18. Plaintiff contends that Rule 8(a)'s general notice pleading standard should apply, noting that the Ninth Circuit has never held that FTC Act claims necessarily "sound in fraud" and require application of Rule 9(b), and that the Complaint's FCRA claims in particular do not allege even quasi-fraudulent or misleading conduct. *See* United States' Opposition to MyLife's Motion to Dismiss (Dkt. 33) ("Opp.") at 3–6. Plaintiff additionally contends that even if Rule 9(b) were to apply, the Complaint satisfies it. *Id.*

"[W]hether or not the heightened pleading standard set forth in Rule 9(b) applies to deceptive practices claims under Sections 5 and 12 of the FTC Act is a

question that has not been resolved in the Ninth Circuit." *FTC v. Lunada Biomedical, Inc.*, No. CV-15-3380-MWF (PLA), 2016 WL 4698938, at *3 (C.D. Cal. Feb. 23, 2016) (quoting *FTC v. Wellness Support Network, Inc.*, No. C-10-04879 JCS, 2011 WL 1303419, at *8 (N.D. Cal. Apr. 4, 2011) (collecting cases)). The Court need not attempt to resolve that open legal question here, because the Complaint's five counts are pled with sufficient particularity to satisfy Rule 9(b).

Despite MyLife's suggestion to the contrary, Rule 9(b) "does not require absolute particularity or a recital of the evidence. [A] complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction' or identify the 'precise method' used to carry out the fraud." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). Moreover, Rule 9(b) "may be relaxed as to matters within the opposing party's knowledge." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). A "pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Id.*

The Complaint here far exceeds the general allegations of a bare notice pleading. It specifies a timeframe, facts that describe the particular conduct that violates the laws cited, and why that conduct violates those laws. Rule 9(b) requires no more. MyLife suggests that the Complaint should be dismissed because it does not allege granular details of specific transactions, but does not articulate *why* it contends the Complaint is not pled with sufficient particularity such that Defendants cannot answer the allegations against them. Rule 9(b) does not require such a level of detail.

### B. The Complaint States a Claim That Defendants' Automatic Renewal Practice is a Negative Option Feature That Violates ROSCA

MyLife contends that Count 3 of the Complaint must be dismissed for failure to plead a "negative option feature" subject to ROSCA. Memo. at 6–9.

A "negative option feature" is defined as "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).  The Complaint adequately pleads the existence of a negative option feature.  A subscription plan in which subscribers pay MyLife to provide one background report per month for the duration of the subscription, for example, is "an offer or agreement to sell or provide any goods or services."  *Id.*  MyLife's automatic renewal policy, in which a subscription automatically renews when its period was set to end—and the subscriber's credit card is subject to recurring charges—unless the subscriber affirmatively cancels, is "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  *Id.*  My Life's automatic renewal default for its subscriptions is a textbook example of a negative option feature.  Indeed, ROSCA's text itself mentions "recurring charges"—a clear reference to a subscription or program that renews automatically unless the consumer takes action to prevent it.[1]

Courts in the Ninth Circuit have also found automatic renewal programs to be negative option features subject to ROSCA.  The court in *FTC v. Health Formulas, LLC,* for example, found that the FTC provided evidence "that Defendants' recurring payment plans, in which customers are automatically enrolled and through which they are charged if they do nothing, constitute negative option features within the meaning of 16 C.F.R. § 310.2 and that they violate the ROSCA in several ways."

---

[1] ROSCA provides that "It shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" as defined in the TSR unless the person provides the required disclosures, consent, and mechanisms to stop "recurring charges."  15 U.S.C. § 8403.

No. 2:14-cv-01649, 2015 WL 2130504, *16–17 (D. Nev. May 6, 2015). That case, like this one, concerned allegations that consumers agreed to receive particular products or services but were not provided with clear disclosures explaining that they would be subject to recurring billing beyond the advertised time period unless they took affirmative steps to cancel their subscriptions. Compare *id.* at *2 (alleging defendants "prominently advertise one-month supplies of their products" but "do not disclose, or only include disclosures in the fine print" that after the "trial period," a customer will "continue to receive—and continue to be charged for—periodic shipments of Defendants' products until they affirmatively cancel their subscriptions") and Compl. ¶¶ 31–33  (alleging Defendants "sold several types of subscriptions, such as one month for $19.95/month, three-month, six-month, [. . . or] discounted trial subscriptions, in which potential users are charged a nominal fee for a period of days, *e.g.*, three or seven days for $1," but "failed to make clear . . . that when a subscriber's subscription period was set to end, Defendants automatically charged them for a renewal subscription unless the subscriber affirmatively acted to cancel his or her subscription.").

MyLife urges the Court to disregard this statutory text and case law applying ROSCA and instead to look to a different FTC rule governing a different type of negative option— *i.e.*, the Prenotification Negative Option Rule codified at 16 C.F.R. § 425.1.[2]  Memo. at 7.  MyLife's argument, in a nutshell, is that because the Prenotification Negative Option Rule does not apply to automatic renewals, automatic renewals are not covered by ROSCA. *Id.*  This contention is frivolous.[3]

---

[2] In prenotification negative option plans, consumers receive periodic announcements of merchandise shipments. If they do not decline the shipment within a set period, the merchandise ships. These plans may last indefinitely. 79 Fed. Reg. 44,271-01 at 44,272.

[3] MyLife's suggestion in its reply brief that the Court should also look to a California
(Continued...)

MyLife misreads the Federal Register notice on which its argument relies. In that notice, the FTC explains that ROSCA regulates automatic renewals and other negative option marketing practices. 79 Fed. Reg. 44,271-01 at 44,272–273 (listing "automatic renewals" as a negative option feature banned by ROSCA absent the required disclosures and protections). The notice squarely rejects MyLife's argument that prenotification negative options are the *only* type of negative option regulated by the FTC, making clear that they are simply "a specific *type* of negative option, the prenotification negative option plan for the sale of goods."[4] *Id.* (emphasis added). Because the goods-related requirements did not necessarily apply to other types of negative option features, the FTC decided not to expand the Prenotification Negative Option Rule to automatic renewals and other types of negative options, reasoning that "[ROSCA] and the Commission's proposed amendments to the [TSR] . . . likely address many of these abuses." *Id.* In any event, as discussed above, ROSCA's text requires the conclusion that ROSCA applies to automatic renewals. The Court thus rejects MyLife's contention that ROSCA does not apply to automatic renewals and declines to dismiss Count 3.

### C. The Complaint Adequately Pleads Claims Under the FCRA

#### 1. The Complaint Alleges MyLife is a Consumer Reporting Agency

MyLife argues that the Complaint does not adequately allege that it is a

---

state statute that does not include the phrase "negative option feature" to define that term in a federal statute is similarly unsupported. *See* Reply at 5–6.

[4] The Prenotification Negative Option Rule imposes merchandise-related requirements that do not apply to other types of negative option features. For example, sellers must abide by certain time periods during which sellers must send introductory merchandise and announcements identifying the merchandise to be sent, give consumers a specific time period to respond to those announcements, provide instructions for rejecting the announced merchandise, and promptly honor written cancellation requests from customers who have met minimum purchase requirements. 79 Fed. Reg. 44,271-01 at 44,272.

consumer reporting agency under the FCRA because the FCRA "only applies to entities that *generate* consumer credit information *about a specific consumer*, such as banks or credit agencies," and the Complaint does not allege that MyLife "generates" such information rather than gathering and compiling it. Memo. at 12 (emphases in original). As Plaintiff points out in its opposition, *see* Opp. at 9, and MyLife does not contest in its reply, *see* Reply at 6–7, the FCRA contains no such limitation. The statute defines "consumer reporting agency" as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f). The FCRA thus "applies to an entity that *assembles or evaluates* consumer information with the intent to provide a consumer report to third parties." *Zabriskie v. Fed. Nat'l Mortg. Ass'n*, 940 F.3d 1022, 1027 (9th Cir. 2019) (emphasis added).

The Complaint clearly alleges that MyLife assembles or evaluates consumer information to include it in reports about individual consumers. It alleges that MyLife "regularly assembles and evaluates information on consumers into consumer reports" that it sells, Compl. ¶ 59, identifies several categories of information on a consumer that MyLife assembles in its reports, *id.* ¶ 27, and alleges that MyLife's consumer reports include a "Reputation Score" created and developed by Defendant Tinsley that purports to evaluate a consumer based on "public information, gathered from government, social, and other sources, plus personal reviews written by others," *id.* ¶¶ 6–7, 26.

The cases MyLife cites do not counsel a different conclusion. *Liberi v. Taitz*, for example, concerned a grant of summary judgment where the court found after full fact discovery that a defendant had "set forth sufficient evidence to establish that [its] Background Reports are designed to be non-person specific searches of public

STATEMENT OF DECISION DENYING MYLIFE.COM, INC.'S MOTION TO DISMISS
CASE NO. 2:20-CV-6692-JFW (PDx)
7

records and publicly available information for non-FCRA purposes." No. SACV 11–0485 AG (AJWx), 2012 WL 10919114, at *6 (C.D. Cal. Mar. 16, 2012). In stark contrast, the Complaint—which must be taken as true for purposes of this motion—alleges that MyLife's reports assemble and evaluate information on individual consumers and are used or expected to be used for FCRA purposes. *Zabriskie*, which MyLife invokes in its reply (Reply at 6) also concerned a summary judgment decision after fact discovery, and the court there found that the defendant, Fannie Mae, was not a credit reporting agency because its "only purpose" for collecting consumer data was to "facilitat[e] a transaction between the lender and Fannie Mae." 940 F.3d at 1027 (internal quotation marks omitted). The Complaint here, by contrast, alleges that MyLife assembles data with the purpose of selling consumer reports to third parties.

## 2. The Complaint Alleges MyLife Provides Consumer Reports

The Court also rejects MyLife's argument that the Complaint fails to allege that MyLife provides consumer reports covered by the FCRA. A consumer report is defined as: "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for" credit, insurance, employment, or other statutorily enumerated reasons.

The Complaint alleges not only that Defendants expected MyLife's consumer reports to be used for employment decisions, tenant screening, and other uses covered by FCRA, but also that Defendants have promoted them for such purposes and were aware that MyLife subscribers used its reports for such purposes. Compl. ¶¶ 9, 25, and 61. For example, Paragraph 25 asserts that "[s]ince at least 2015, in their marketing and advertising, Defendants have promoted the use of MyLife

background reports in establishing an individual's eligibility for employment, loans, and housing, displaying testimonials in which customers praised MyLife's background reports as helpful for such purposes."

Ignoring these detailed allegations, MyLife asserts first that the Complaint uses only conclusory words like "'expected'—without any additional factual allegations." Memo. at 13; *see also* Reply at 6. But the Complaint's allegations that Defendants knew their products had been used for FCRA-authorized purposes, and have promoted their products as suitable for those purposes, adequately pleads that MyLife's reports were used or expected to be used in whole or in part for a FCRA purpose. *See Robins v. Spokeo, Inc.*, No. CV10–05306 ODW (AGRx), 2011 WL 1793334, at *2 n.3 (C.D. Cal. May 11, 2011) ("Plaintiff's allegations that Defendant expects its reports to be used for unauthorized FCRA purposes because Defendant's reports contain information traditionally associated with 'consumer reports' and Defendant markets such reports to 'HR professionals and potential employers' are sufficient to support a plausible inference that Defendant's reports are 'consumer reports' within the scope of the FCRA.") (internal citation omitted).

Second, MyLife asserts that "the Complaint fails to allege whether MyLife background reports are requested by subscribers for their *own* information," and it cites a case concerning a report that was designed to be accessible to only the individual subject of that report. Memo. at 13 (citing *Kauffman v. Kauffman*, No. CV-17-04463-PHX-DGC, 2018 WL 2463945, at *4 (D. Ariz. June 1, 2018)). Those facts bear no resemblance to the allegations here. The Complaint alleges that although some subscribers use MyLife background reports to see what information is available about themselves, others use MyLife's reports for various other purposes, including deciding whether to rent to or from someone, and it alleges that MyLife obtained and promoted customer testimonials praising its reports as useful for employment, loan, and housing purposes. Compl. ¶¶ 9, 25. Even MyLife's motion

promotes its reports as helping subscribers "learn about other people." Memo. at 3.

Third, MyLife argues that FCRA-related disclaimers on its website "clearly reflect an expectation that its background reports will *not* be used for FCRA purposes." Memo. at 14; *see also* Reply at 8. But "an entity may not escape regulation as a 'consumer reporting agency' by merely disclaiming an intent to furnish 'consumer reports.' For the purposes of the FCRA, indeed for any scienter determination, the totality of a defendant's actions is the determining factor, not the defendant's mere disclaimer of the requisite intent." *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106–07 (2d Cir. 2019) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007) and *Ricci v. DeStefano*, 557 U.S. 557, 579–80 (2009)). Fact discovery to evaluate the totality of Defendants' actions here has not yet occurred, and the mere presence of certain disclaimers does not warrant dismissal of the FCRA claims. *See Robins*, 2011 WL 1793334, at *2 n.3 (denying motion to dismiss where defendant argued that online FCRA disclaimer showed it did not provide consumer reports); *Liberi*, 2012 WL 10919114, at *6 (considering evidence of defendant's FCRA-related user terms and conditions when deciding summary judgment motion).

Finally, MyLife asserts that the purpose for which a report is actually used "doesn't matter under the statute in the Ninth Circuit," Memo. at 14, attempting to render irrelevant the Complaint's allegations that MyLife is aware its subscribers have used its reports to determine whether to rent to or from someone. Compl. ¶ 9. But the plain language of the FCRA defines a "consumer report" as one that "is used *or* expected to be used" for a FCRA-authorized purpose. 15 U.S.C. § 1681a(d)(1) (emphasis added). The cases MyLife cites stand for the unremarkable proposition that that if a defendant expects its reports to be used for a FCRA-purpose, the FCRA's "consumer report" definition is satisfied regardless of the purpose to which the reports are actually put. *See Comeaux v. Brown & Williamson Tobacco Co.*, 915

F.2d 1264, 1274 (9th Cir. 1990); *Liberi*, 2012 WL 10919114, at *6. These cases mean not that the purpose for which a report is used does not matter, but that to plead a FCRA claim, a plaintiff may allege that a report is used for a FCRA purpose *or* that the provider expects it to be used for such a purpose. *Johnson v. Wells Fargo Home Mortg., Inc.*, No. 3:05–CV–0321–RAM, 2007 WL 3226153, at *7 (D. Nev. Oct. 29, 2007) (citing *Ippolito v. WNS, Inc.*, 864 F.2d 440, 449 (7th Cir. 1988)), *aff'd in part*, 635 F.3d 401 (9th Cir. 2011). Here, the Complaint alleges both, and Counts 4 and 5, which allege violations of the FCRA, will not be dismissed.

### D. The Complaint Adequately Pleads That Defendants Are Engaged in Telemarketing That Violates the TSR

The Complaint alleges that Defendants engaged in abusive and deceptive telemarketing on outbound calls to consumers and also on inbound calls from consumers trying to cancel their subscriptions, in which MyLife provided "a sales pitch to renew rather than assistance in cancelling." Compl. ¶¶ 30, 36, 45–48. MyLife argues that "[t]he TSR applies only to outbound communications initiated by a telemarketer," and asks the Court to dismiss the Complaint's TSR count "as to any conduct" other than outbound telemarketing calls. Memo. at 16–17.

MyLife is mistaken. The TSR's definition of "telemarketing" does not distinguish between outbound and inbound telephone calls, requiring only "a plan, program or campaign which is conducted to induce the purchase of goods or services . . . by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg); *FTC v. LaLonde,* 545 F. App'x 825, 839–40 (11th Cir. 2013) (inbound calls are not exempt from the TSR's coverage); *see also FTC v. Inbound Call Experts LLC,* No. 14-81394-CIV, 2014 WL 8105107 (S.D. Fla. Dec. 23, 2014) (granting preliminary injunction against defendants who operated an inbound call center that generated calls from consumers and engaged in deceptive practices during those calls); *FTC v. Data Medical Capital, Inc.*, No. 2010 WL

1049977, at *24 (C.D. Cal. Jan. 15, 2010) (permanent injunction issued under TSR applied to contempt defendants' inbound telemarketing).

MyLife's effort to exclude inbound calls from the scope of the TSR relies entirely on the TSR exemptions in 16 C.F.R. § 310.6. The plain language of the regulations forecloses this argument. The TSR exemptions set forth in 16 C.F.R. § 310.6 make clear that while calls "initiated by a customer" in response to an advertisement are exempt, "this exemption does not apply to . . . (iii) Any instances of upselling included in such telephone calls.") 16 C.F.R. § 310.6(b)(5)(iii). Paragraphs 8 and 36 of the Complaint allege that customers who called MyLife to cancel a subscription, disable the automatic-renewal feature of the subscription, or obtain a refund were unsuccessful at doing so—resulting in MyLife continuing to charge the consumer—or were pressured by MyLife's customer service agents to renew their subscriptions.

In its reply brief, MyLife argues for the first time that "a sales pitch to renew" a subscription is not subject to the TSR because it does not involve "the purchase of anything additional." Reply at 8–10. The Court will not consider a new argument raised for the first time in a Reply, and in any event, concludes that this argument is more appropriately resolved on a motion for summary judgment. Accordingly, the Court declines to dismiss the Complaint's TSR claim, Count 2, as to alleged inbound telemarketing calls.

### E. *Shire ViroPharma* Does Not Bar the United States' Claims for Injunctive Relief

Each of the Complaint's counts includes allegations of current, ongoing conduct, but MyLife contends that because several of the Complaint's allegations are phrased in the past tense, *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) requires dismissal of the United States' claims for injunctive relief.

As an initial matter, *Shire ViroPharma* is a single, out-of-circuit case that

conflicts with governing Ninth Circuit precedent. *See FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). In fact, multiple district courts in this circuit have rejected or declined to follow *Shire ViroPharma*. *See, e.g., FTC v. Elec. Payment Sols. of Am. Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9–*10 (D. Ariz. Aug. 28, 2019); *FTC v. Adept Mgmt. Inc.*, No. 1:16-cv-720, 2019 WL 2433193, at *1 (D. Or. June 7, 2019).

Moreover, even if *Shire ViroPharma* governed cases in Ninth Circuit district courts—which it does not—it is distinguishable on its facts. In *Shire ViroPharma*, the FTC sued five years after a drug manufacturer ceased its allegedly illegal conduct and two years after the manufacturer had divested itself of the drug. The Third Circuit held that conduct in the "distant past" did not satisfy the "about to violate" language of Section 13(b). *Shire ViroPharma*, 917 F.3d at 159. Importantly, the Third Circuit explicitly limited its holding to these facts, noting that "[w]hatever the outer reach of 'about to violate' may be, the facts in this case do not approach it. We therefore leave for another day the exact confines of Section 13(b)'s 'about to violate' language." *Id.* at 160.

The alleged facts of this case are fundamentally different from those of *Shire ViroPharma* and beyond the limits of its holding. Here, the Complaint alleges that Defendants have continued their misconduct even after they faced complaints and lawsuits by consumers and regulators and have agreed to stop the conduct. Compl. ¶¶ 6, 37. If Defendants have in fact now ceased any of the alleged conduct—and fact discovery has not progressed sufficiently to determine the truth of that claim—they may only have stopped as a result of the FTC's investigation, and courts have repeatedly held that defendants' cessation of violations as a direct result of government intervention is treated as if the violations never stopped—or, at a minimum, are imminently about to recur. *See, e.g. FTC v. Triangle Media Corp.*, No. 18cv1388-LAB(LL), 2018 WL 6305675, at *1 (S.D. Cal. Dec. 3, 2018).

Plaintiff properly alleges that Defendants' conduct is likely to recur, and thus states a claim under FTC Act Section 13(b).

### F. Restitution and Disgorgement Are Available Remedies

Finally, MyLife contends that Plaintiff cannot seek restitution in connection with Count 1, which alleges a violation of Section 5 of the FTC Act.[5] However, the Ninth Circuit has consistently held that Section 13(b) of the FTC Act "empowers district courts to grant any ancillary relief necessary to accomplish complete justice, including restitution." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (internal quotation marks omitted); *see also FTC v. Neovi, Inc.,* 604 F.3d 1150, 1159–60 (9th Cir. 2010); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994) ("[T]he authority granted by section 13(b) ... includes the power to order restitution."). In fact, *AMG Capital Management, LLC*, 910 F.3d 417 (9th Cir. 2018), which MyLife cites, forecloses "due to precedent" MyLife's exact argument that Section 13(b) does not authorize monetary relief. 910 F.3d at 426. The Court will not dismiss Plaintiff's prayer for relief that the Ninth Circuit has repeatedly held is permissible, regardless of MyLife's assertion that a separate Circuit has reached a different conclusion or its speculation that the Supreme Court is "likely" to side with that other Circuit. Memo. at 20.

### III. CONCLUSION

For the foregoing reasons, MyLife's motion to dismiss is DENIED in its entirety.

Dated: November 6, 2020

_____
The Honorable John F. Walter
United States District Court Judge

---

[5] MyLife does not dispute that restitution and disgorgement are available remedies as to Count 2 (TSR) and Count 3 (ROSCA), pursuant to Section 19 of the FTC Act. Section 19 to the FTC Act expressly authorizes the Court to award such relief as "rescission or reformation of contracts, the refund of money or return of property, [and] the payment of damages." 15 U.S.C. § 57b(b).